
RECEIVED
FEB - 6 2006

# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | |
|---|---|
| **BRENDA HARMON** | **CIVIL ACTION NO. 04-2569** |
| **VERSUS** | **JUDGE DOHERTY** |
| **JO ANNE BARNHART,**<br>**Commissioner of Social Security Administration** | **MAGISTRATE JUDGE METHVIN** |

## REPORT AND RECOMMENDATION

Before the court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable law, the court

concludes that there is substantial evidence to support the ALJ's finding that Harmon is not

disabled. Accordingly, the Commissioner's decision is **AFFIRMED.**

### *Background*

Born on June 24, 1959 Brenda Harmon ("Harmon") is currently 46 years old.[1] She has a

twelfth grade education.[2] Harmon received SSI benefits from August 6, 1991 through

September 1, 1999.[3] Harmon applied for SSI benefits in 2002, but this claim was denied, and

Harmon did not appeal.[4] Harmon's non-disability is therefore res judicata through

February 28, 2003, the date of the decision.[5]

---

[1] Tr. 16.

[2] Id.

[3] Tr. 15.

[4] Id.

[5] Id.

On May 19, 2003, Harmon filed the instant application for supplemental security income benefits under title XVI of the Social Security Act, alleging disability due to sickle cell anemia, high blood pressure, diabetes, arthritis and depression.[6] Harmon's application was denied at the initial and reconsideration levels, and then by an Administrative Law Judge on May 27, 2004, following an administrative hearing held March 19, 2004.[7] On July 12, 2004, the Appeals Council denied claimant's request for review of the ALJ's denial of her claim.[8] Claimant filed the instant action in this court on December 20, 2004, seeking review of the Commissioner's denial of benefits, seeking supplemental security income benefits for the closed period from May 19, 2003 (the date of application) through May 27, 2004 (date of ALJ decision).[9] The government moved to dismiss her complaint as untimely; however, the court denied the motion.[10]

### Standard of Review

The court's review is restricted under 42 U.S.C. §405(g) to two inquiries: (1) whether the Commissioner's decision is supported by substantial evidence in the record; and (2) whether the decision comports with relevant legal standards. Carey v. Apfel, 230 F.3d 131, 136 (5th Cir. 2000); Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir.1992); Greenspan v. Shalala, 38 F.3d 232,

---

[6] Tr. 65. The ALJ noted that Harmon received supplemental security income from August 6, 1991 through September 1, 1999 (Tr. 15). The ALJ further noted that Harmon filed another application for SSI benefits on April 10, 2002, with a hearing on February 4, 2003, and a decision denying benefits was rendered on February 28, 2003 (Tr. 15).

[7] Tr. 22.

[8] Tr. 4-7.

[9] Harmon states that she filed a new application, was awarded, and has been receiving supplemental security income benefits through the present date. Rec. Doc. 13 at 2.

[10] Rec. Docs. 5, 10, 12.

236 (5th Cir. 1994). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Carey, 230 F.3d at 136; Anthony, 954 F.2d at 292; Carrier v. Sullivan, 944 F.2d 243, 245 (5th Cir. 1991). The court may not reweigh the evidence in the record, nor substitute its judgment for that of the Commissioner, even if the preponderance of the evidence does not support the Commissioner's conclusion. Carey, 230 F.3d at 136; Johnson v. Bowen , 864 F.2d 340, 343 (5th Cir.1988). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the decision. Johnson, 864 F.2d at 343.

## *ALJ's Findings*

In determining whether a claimant is capable of performing substantial gainful activity, the Secretary uses a five-step sequential procedure set forth in 20 C.F.R. §404.1520(b)-(f) (1992):

1. If a person is engaged in substantial gainful activity, he will not be found disabled regardless of the medical findings.

2. A person who does not have a "severe impairment" will not be found to be disabled.

3. A person who meets the criteria in the list of impairments in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.

4. If a person can still perform his past work, he is not disabled.

5. If a person's impairment prevents him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

4

In the instant case, the ALJ found Harmon's sickle cell disease to be a severe impairment, but one which does not meet the requirements of Listing 7.05.[11] Recognizing that Harmon has a "long history of sickle cell anemia and has joint pain," the ALJ found that limiting Harmon to sedentary work activity should not cause excessive pain.[12] The ALJ determined that, although stooping and climbing would cause Harmon some discomfort, only occasional stooping and climbing, up to one-third on a given work day, would reasonably accommodate the problem.[13] The ALJ defined sedentary work as work that "involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers, and small tools."[14] The ALJ further noted that "[a]lthough a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."[15]

The ALJ found that Harmon has no vocationally relevant past work.[16] The ALJ proceeded to the fifth step to determine whether Harmon retains the functional capacity for other vocationally relevant work. Relying on the testimony of a vocational expert given in a previous administrative hearing on February 4, 2003 (thirteen months earlier) as well as consulting the

[11] Tr. 17, 21.

[12] Tr. 18.

[13] Tr. 18.

[14] Tr. 18.

[15] Tr. 18.

[16] Tr. 21.

mem  C:\Social Security\R&Rs\042569 Harmon.RevisedR&R SS.wpd1/30/06

Grids, the ALJ concluded that Harmon retains the capacity for work that exists in significant numbers in the national economy, and is therefore not disabled.[17]

## *Assignment of Errors*

Harmon alleges the following errors: 1) the ALJ erred in failing to assign adequate weight to her testimony regarding the level of her disabling pain; 2) the ALJ erred in failing to assign adequate weight to the exertional impairments Harmon described at the hearing; and (3) the ALJ erred when he relied on vocational testimony given in a prior hearing that did not address the additional limitations that Harmon contends disallow her from performing a full range of sedentary work.

## *Findings and Conclusions*

After a review of the entire record and the briefs of the parties, and pursuant to 42 U.S.C. § 405(g), the court concludes that the ALJ's findings and conclusions are supported by substantial evidence in the record.

---

[17] Tr. 20-23. The ALJ adopted the vocational expert testimony of Thomas LaFosse that , assuming "the hypothetical individual's specific work restrictions," Harmon was capable of making a vocational adjustment to other work such as a laborer (excluding construction laborer); truck driver; assembler; and product inspector checker, all identified as sedentary, semi-skilled jobs. Entry level laborer (excluding construction positions), freight stocker, hand packager, assembler, and order clerk for food and beverage were also identified as sedentary, unskilled positions. Tr. 20.

1.    **Medical History**[18]

**Emergency Room Visits:**  On March 20, 2003, Harmon visited UMC for dizziness and

a sickle cell crisis.[19]  Progress notes indicate that  Harmon was given several samples of drugs,

including Vioxx, for her arthritis, instructed to diet and exercise and that she was non-compliant

with her hypertension medications.[20]  The notes indicate that her sickle cell condition was

stable.[21]

On July 17, 2003, Harmon was again examined at UMC for diabetes, hypertension and

sickle cell crisis with arm and left knee pain.[22]  Harmon also complained of sinus problems and

arthritis pain.  Physician notes indicate "DM-AC - good" and that she continue meds; however,

the notes state that Harmon is "not compliant with diet/exercise.[23]  The notes indicate that

---

[18] The record includes evidence that Harmon was treated for her sickle cell disease several times during 2002; however, this medical treatment that does not fall within the relevant period. (On July 16, 2002 her lab work indicated an hematocrit level of 29.0 and hemaglobin of 10.  Harmon was told her lab work was "ok." Tr. 149.  On October 17, 2002, Harmon visited UMC for diabetes mellitus and arthritis. Tr. 128.  The physician's notes indicate that Harmon's sickle cell disease was stable, that she did not appear to be in distress, and that her diabetes mellitus was under control.  She was prescribed Vioxx for her arthritis and Mavik for hypertension. Tr. 128.  Harmon also visited the emergency room at America Legion Hospital on November 28 and again on November 29, 2002 for a sickle cell crisis. Tr. 101-122. On November 28, she complained of pain in her right shoulder and elbow and in both legs; her lab work showed a hematocrit of 27.4. (Tr. 112, 115 Harmon was offered admission on November 28; however, she declined. (Tr. 111).  Harmon returned to the emergency room on November 29, again with sickle cell pain in her right shoulder and leg. Harmon went home the same day with "improved" condition. Tr. 102, 103.  As to each visit, the physician noted she was not in acute distress. Tr. 103, 111).

[19] Tr. 127.

[20] Tr. 127.

[21] Id.

[22] Tr. 123.

[23] Tr. 123.

hypertension "much better" and "add Hyzaar."[24] Harmon indicated she did not want go to New Orleans for an eye exam.[25] Harmon was prescribed Vioxx for her arthritis and directed to lose weight. The notes indicate that her sickle cell condition was stable.[26]

## Hospital Admissions:

Harmon was hospitalized at the American Legion Hospital in Crowley from October 10 to October 13, 2003 for a sickle cell crisis.[27] Physical examination showed tenderness to very mild, light palpation of the distal forearm/wrist area .[28] On October 10, Harmon's hemoglobin and hematocrit were 10.0 and 29.0.[29] Harmon was given intravenous hydration, pain medications/analgesics, including morphine, Demerol and Tylox.[30] and MS Contin was added to her medications which included Mavik, Glucophase, folic acid and Lipitor.[31] On October 11, Harmon's hemoglobin and hematocrit were 8.9 and 25.7.[32] Although "[s]he was offered to stay another day", she requested to go home and was discharged on October 13, 2003 .[33] Harmon's

---

[24] Id.

[25] Id.

[26] Tr. 150.

[27] Tr. 174-188.

[28] Tr. 176.

[29] Tr. 176, 178.

[30] Tr. 174.

[31] Tr. 180.

[32] Id.

[33] Tr. 174.

pain improved every day and she was discharged in stable condition and directed to follow up with UMC.[34]

Harmon was hospitalized again from November 8-10, 2003 for sickle cell pain crisis with pain in her left arm and chest.[35] She was given IV fluids and analgesics as well as transfusion since she was having chest pain. On November 8, Harmon's hemoglobin and hematocrit were 9.0 and 27.4 and on November 9, they were 11.0 and 32.0.[36] Upon discharge the pain crisis was totally abated.[37]

### DDS Evaluations:

At the request of Disability Determination Services ("DDS"), Harmon was examined by Dr. Mark H. Dawson, a family doctor, on August 29, 2003.[38] Dr. Taylor found that Harmon had hypertension, under good control, diabetes mellitus, and sickle cell anemia.[39] Dr. Dawson found that she had no exertional, postural, manipulative, visual or communication limitations.[40] However, Dr. Dawson recognized that Harmon has environmental limitations, concluding that she should not get overheated due to her sickle cell anemia.[41]

---

[34] Id.

[35] Tr. 189-209.

[36] Tr. 192, 194, 202, 203.

[37] Tr. 200.

[38] Tr. 171-172.

[39] Tr. 172.

[40] Id.

[41] Id.

**2.** **Listing 7.05**

Harmon admits that she does not meet the requirements of Listing 7.05, but she argues

that she meets the "functional equivalence" of the Listing when it is viewed "in combination as

opposed to singularly."

Listing 7.05 states:

*7.05 Sickle cell disease, or one of its variants.* With:

A. Documented, painful (thrombotic) crises occurring at least 3 times during the 5
months prior to adjudication; or

B. Requiring extended hospitalization (beyond emergency care) at least 3 times
during the 12 months prior to adjudication; or

C. Chronic, severe anemia with persistence of hematocrit of 26% or less; or

D. Evaluate the resulting impairment under the criteria for the affected body
system.

### *Meeting* **the Listing:**

Harmon concedes she has not had three documented painful thrombotic crises, nor has

she been hospitalized for an extended period three times during a 12 month period. Further, her

hematocrit level has not been persistently below 26% or less. It is not enough that the

impairment have the diagnosis of a listed impairment; it must also have the findings shown in the

Listing of that impairment. 20 C.F.R. § 404.1525(d). The Supreme Court has stated, "[f]or a

claimant to show that his impairment matches a listing, it must meet *all* of the specified medical

criteria. An impairment that manifests only some of those criteria, no matter how severely, does

not qualify." Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967

(1990)(footnote omitted). Harmon's concedes, and the record supports that her impairment does

not match each characteristic of Listing 7.05; therefore, she does not meet the listing.

### *Equalling* the Listing:

Harmon argues that "when the Listing is viewed in combination as opposed to singularly, the functional equivalence of the Listing is met . . . as described in the record.[42] The Supreme Court has stated, "[a] claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." Sullivan, 493 U.S. at 531. Therefore, Harmon's argument "is misplaced as *medical* equivalence, rather than *functional* equivalence, is the standard for comparison." Chavez v. Apfel, 2001 WL 169732 (N.D.Tex. 2001).

To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment . . . ." Tackett v. Apfel, 180 F.3d 1094 (9th Cir. 1999), relying on § 404.1526. "The claimant must provide medical findings that support each of the criteria for the equivalent impairment determination." Selders v. Sullivan, 914 F.2d 614 (5th Cir. 1990), citing, Sullivan v. Zebley, 110 S.Ct. at 891-92; 20 C.F.R. 404.1526(a).

Medical equivalence for adults and children under 20 C.F.R. 416.926 provides that a claimant's impairment may be medically equivalent to a listed impairment if the medical findings are at least equal in severity and duration to the listed findings. This regulation further provides that, where a claimant has a listed impairment, but the claimant either (1) does not exhibit one or more of the medical findings specified in the particular listing or (2) exhibits all of the medical findings, but one or more of the findings is not as severe as specified in the listing, the claimant's

_____

[42] Rec. Doc. 13 at 4.

impairment will be found medically equivalent to that listing if other medical findings related to the impairment are of at least of equal medical significance.[43]

### Part A - Painful (thrombotic) Crises:

Harmon argues that "the record indicates, via the claimant's testimony that although she has pain most of the time . . that she has real bad days 4 days out of a week" and that "Part A of the Listing would be satisfied, if at least one day per month in the 5 months prior to the hearing date would rise to this level of painful (thrombotic) crises."[44] Part A of the Listing requires *documented*, painful (thrombotic) crises, occurring at least 3 times during the 5 months prior to adjudication (emphasis added). Although Harmon had complaints of constant joint pain, specifically in her left elbow and knees, stomach and chest, the record is void of three documented, painful (thrombotic) crises during the 5 months prior to adjudication as required by the listing. As Harmon has failed to provide any documentation of her painful crises, she has not presented the evidence necessary to show her impairment medically equivalent to the Listing.

---

[43] 20 C.F.R. 416.926, Medical equivalence for adults and children, provides:

(A) *How medical equivalence is determined.* We will decide that your impairment(s) is medically equivalent to a listed impairment of appendix 1 of sub-part P of part 404 of this chapter if the medical findings are at least equal in severity or duration to the listed findings. We will compare the symptoms, signs, and laboratory findings about your impairment(s), as shown in the medical evidence we have about your claim, with the corresponding medical criteria shown for any listed impairment. When we make a finding regarding medical equivalence, we will consider all relevant evidence in your case record. Medical equivalence can be found in two ways:

(1)(i) If you have an impairment that is described in the Listing of Impairments, in appendix 1 of subpart P of part 404 of this chapter, but –

(A) You do not exhibit one or more of the medical findings specified in the particular listing; or

(B) You exhibit all of the medical findings, but one or more of the findings is not as severe as specified in the listing;

(ii) We will nevertheless find that your impairment is medically equivalent to that listing if you have other medical findings related to your impairment that are of at least of equal medical significance. . .

(B) *Medical equivalence must be based on medical findings.* We will always base our decision about whether your impairment(s) is medically equal to a listed impairment on medical evidence only. Any medical findings in the evidence must be supported by medically acceptable clinical and laboratory diagnostic techniques. We will also consider the medical opinion given by one or more medical psychological consultants designated by the Commissioner in deciding medical equivalence. (See § 416.1016.).

[44] Rec. Doc. 13 at 5.

Moreover, although Harmon offers her own testimony to support the finding that her pain is constant and equivalent to the painful crises described in the Listing and, therefore, wholly disabling, this evidence is insufficient to equal the listing. The ALJ evaluated Harmon's allegations of disabling pain, compared it with prior statements and other evidence and found that Harmon's pain is limiting but not severe enough to preclude her from engaging in all types of work activity.[45] Therefore, Harmon's undocumented testimony is insufficient to show that her pain crises are of the severity or duration as the painful crises described in Part A of Listing 7.05. Accordingly, the undersigned magistrate judge finds that Harmon has not shown, nor does the record evidence show, that her impairment is the medical equivalent of Part A of the Listing.

### Part B - Sickle Cell Requiring extended hospitalization (beyond emergency care)

Harmon then argues that her two emergency room visits in March and in July 17, 2003 "should be fairly equal to one extended hospitalization" so that she meets Part B of the listing. The Listing directs that the claimant's sickle cell disease *require extended* hospitalization *"beyond emergency care"* at least three times during the 12 months prior to adjudication (emphasis added). Harmon's sickle cell disease was in crisis and required hospitalization twice during 2003. While Harmon's hospitalization admissions at American Legion Hospital in Crowley were 2-3 days, her treatment at UMC during March and July was outpatient.[46] Physician's notes made during her hospital stay indicate that Harmon was in sickle cell crisis; however, notes during the UMC visits indicate that her sickle cell condition is "stable"and do not indicate that Harmon required extended treatment at the time of her emergency visits.[47] In fact,

---

[45] Tr. 19.

[46] Tr. 127, 128, 174-176, 200-201.

[47] Tr. 127, 128,174, 200.

Dr. Neal Duhon's notes during Harmon's October 10, 2003 hospitalization indicate that Harmon stated to him that her last sickle cell crisis "was a few years ago.[48] As opposed to her treatment at UMC, during her two hospitalizations, Harmon received extended treatment, including a blood transfusion during her November, 2003 hospitalization.[49] Harmon has not shown nor does the record support the finding that her UMC visits were the equivalent of an extended hospitalization nor did she show that her sickle cell disease *required* extended hospitalization at the time of her UMC visits. Thus, Harmon's emergency room visits are insufficient to equal the requirements of Part B.

### C. Chronic, severe anemia with persistence of hematocrit of 26% or less

Harmon also argues that her hematocrit level was consistently low and that "[t]ypically she was at 29% or lower, and she sometimes fell below the 26% threshold."[50] Listing 7.05 requires a showing of "chronic, severe anemia with persistence of hematocrit of 26 percent or less." Listing 7.00(B) states, "*[c]hronicity is indicted by* persistence of the condition for at least three months. The laboratory findings cited must reflect the values reported on more than one examination over that 3-month period." On October 10, 2003, Harmon's hematocrit was 29.0.[51] On October 11, 2003, Harmon's hematocrit was 25.7.[52] On November 8, 2003, Harmon's hematocrit was 27.4 and on November 9, 2003, her hematocrit was 32.0.[53] The record does not

---

[48] Tr. 175.

[49] Tr. 200, 201.

[50] Rec. Doc. 13 at 6.

[51] Tr. 176, 178.

[52] Tr. 180.

[53] Tr. 192, 194, 202, 203.

support the finding that Harmon's hematocrit remained persistently at 26% or less for a three month period. Harmon has not demonstrated diagnostic evidence that her hematocrit level is substantially the equivalent to chronic, severe anemia with persistence of hematocrit of 26% or less.

### Consideration of Medical Findings in Combination

Harmon argues, in sum, that, "when considered together" she "meets a Listing Level impairment due to the combination of persistently low hematocrit, multiple extended hospitalizations with additional emergency room visits during the 12 months prior to adjudication, and documented painful thrombotic crises occurring many times during the 5 months prior to adjudication."[54] Other than her own testimony, Harmon has not demonstrated any medical evidence to support her argument that, since her findings closely approximate each of the parts of Listing 7.05, she equals it. The ALJ's determination that Harmon's impairment did not equal Listing 7.05 was supported by substantial evidence in the record as a whole.

Accordingly, the undersigned concludes that Harmon does not meet or equal the requirements of Listing 7.05. Further, a review of the record shows that there is no medical evidence showing that Harmon's sickle cell disease has resulted in disorganization of motor function in two extremities. Thus, the ALJ did not err in finding that Harmon did not meet or equal the requirements of Listing 7.05.

---

[54] Rec. Doc. 13 at 6.

**3.    Credibility determination**

Harmon maintains that the ALJ erred in discounting her allegations of pain and exertional limitations.

The ALJ has discretion to determine the disabling nature of subjective complaints of pain, "at least where the medical evidence is inconclusive." Cook v. Heckler, 750 F.2d 391, 395 (5th Cir. 1985); Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987). The ALJ's determination in this regard is entitled to considerable deference. Id. However, if uncontroverted medical evidence reveals a basis for the subjective complaints of pain, the "ALJ's unfavorable credibility evaluation of a claimant's complains of pain will not be upheld on judicial review . . . at least where the ALJ does not on an articulated basis weigh the objective medical evidence in assigning reasons for discrediting the claimant's subjective complaints of pain." Cook v. Heckler, 750 F.2d at 395. The ALJ is responsible for assessing the medical evidence and determining the claimant's residual functional capacity. Perez v. Heckler, 777 F.2d 298, 302 (5th Cir. 1985). The ultimate issue of disability is reserved to the Commissioner.

Harmon argues that the ALJ incorrectly assessed her credibility and the ALJ's residual functional capacity assessment was erroneous. Harmon maintains, therefore, that the ALJ erred in finding that she could perform sedentary work. Here, the ALJ weighed the medical evidence and Harmon's testimony and determined that Harmon retained the residual functional capacity to perform sedentary work with no more than occasional stooping and climbing.

The ALJ summarized Harmon's overall condition as follows:

> With respect to the subjective complaints and limitations with respect to the claimant's activities of daily living, the evidence of record reveals the following. The claimant testified at the March 18, 2004 hearing that the condition had worsened. She said she weighed 345 pounds six or seven months ago and now weighs 276 pounds, and indicated that she is losing weight due to diabetes. The claimant stated that she had worked one day as a dishwasher and had too much

pain in her joints. She testified that she had a driver's license but no car. The claimant stated that she cannot work because she is in a lot of pain due to sickle cell anemia which causes pain in all her joints. She said she has constant pain in her chest, elbows and knees, as well as high blood pressure with headaches, eye strain, and diabetes mellitus. The claimant testified that she has pain most of the time that travels to various parts of her body. She said she has real bad days four days out of a week. The claimant stated that she follows the diabetic diet and said she has had arthritis since she was in the 7th grade. She estimated that she could stand for 7 or 8 minutes and would then start hurting in her back and knees; sit for 20 to 30 minutes; and walk from her porch to the road, about a half block.[55]

The ALJ also noted the following with respect to Harmon's daily activities:

The claimant testified at the March 18, 2004, hearing that she visited with friends and relatives; watched television, and shopped with her sister.[56]

The ALJ addressed each of Harmon's physical complaints. He noted that she has a history of hypertension with no evidence of end damage, that she had been diagnosed with diabetes mellitus but that medical records show that she has been non-compliant with diet and exercise, and that she had been prescribed an anti-inflammatory medication for arthritis pain, but had full range of motion of all joints with normal gait.[57] The ALJ also noted that Harmon has a "plethora of physical complaints," that she had recently lost 65 pounds due to diabetes, and that he had evaluated her obesity under the criteria set forth in Social Security Ruling 02-1p.[58] The ALJ found that the record does not establish the existence of arthritis in the lumbosacral spine or weight bearing joint, hypertension with diastolic blood pressure persistently in excess of 100

---

[55] Tr. 18.

[56] Tr. 19.

[57] Id.

[58] Id.

mm. Hg., or a history of congestive heart failure, chronic venous insufficiency, or respiratory

disease. [59] The ALJ concluded:

> The Administrative Law Judge does not discount all of the claimant's complaints. She clearly has sickle cell anemia with joint pain. However, the claimant's treating physicians did not place any functional restrictions on her activities that would preclude sedentary work activity with the previously-mentioned restrictions. She has required brief hospitalizations, and her condition has quickly improved. The claimant's daily activities are consistent with the performance of sedentary work. Given the objective medical evidence in the record, the Administrative Law Judge finds that the claimant's residual functional capacity is reasonable, and that the claimant could function within those limitations without experiencing significant exacerbation of her symptoms.[60]

The court's function is to determine whether substantial evidence supports the ALJ's

decision. As set forth above, a finding of no substantial evidence is appropriate only if no

credible evidentiary choices or medical findings exist to support the decision. Johnson v.

Bowen, 864 F.2d 340, 343 (5th Cir.1988). Here, the medical evidence supports the ALJ's finding

that Harmon retained the residual functional capacity to perform sedentary work activity with no

more than occasional stooping and climbing.[61] Harmon maintains that she credibly testified that

she cannot stand for more than 7 to 8 minutes or sit more than about 20 to 30 minutes before pain

would force her to alternate positions, that she could only walk a half block before pain would

force her to stop, and that she was unable to work more than a day at Studebaker's Restaurant

because she was unable to stand up on the floor long enough to do the job.

Harmon argues that the ALJ improperly relied on the consultative examination report

prepared by Dr. Mark H. Dawson that provided only a "snapshot" view of her sickle cell disease

and that the very next month she was hospitalized for treatment of her sickle cell crisis. The ALJ

---

[59] Tr. 19.

[60] Tr. 19-20.

[61] Tr. 18.

can properly rely on the opinion of a consultative examiner. See 20 C.F.R. § 404.1517-1519(a). The opinion of a consultative examiner may constitute substantial evidence. Bradley v. Bowen, 809 F.2d 1054 (5th Cir. 1987). In this case, none of Harmon's treating physicians placed any functional restrictions on her activities that would preclude sedentary work activity with no more than occasional stooping and climbing.

Further, the ALJ's decision to discount Harmon's allegations regarding her limitations is supported by the record. The ALJ found that "the pain experienced by the claimant is limiting but, when compared with the total evidence, not severe enough to preclude all types of work."[62] Although the ALJ discounted Harmon's allegations of disabling limitations, it is clear that he did give her the benefit of the doubt in areas that have medical support, i.e., he accepted that her impairments preclude her from performing all work except work within the confines of limited sedentary work. If the ALJ had found Harmon completely incredible, he would not have found her limited in any way. Instead, however, the ALJ closely assessed the medical evidence and determined that she did have impairments that precluded some types of work, however, she could perform limited sedentary work. Although it is clear that Harmon has pain and limitations posed by her impairments, that alone is insufficient for a disability finding – the impairments must preclude her from being able to perform work activities. Here, as found by the ALJ, the record supports a finding that Harmon can perform sedentary work with no more than occasional stooping and climbing, and therefore, she is not disabled.

---

[62] Tr. 19.

4.    **Vocational Expert Testimony**

Harmon argues that the ALJ "erred in failing to secure updated vocational testimony and then relying on the vocational testimony of an expert in a prior hearing" where the ALJ in the instant action concluded that "Harmon's additional limitations would not allow her to perform a full range of sedentary work."[63] Although the burden is on Harmon to support her contention by citations to statutes, regulations and cases supporting her position, Harmon has failed to provide any authority for her argument that the ALJ cannot rely on vocational testimony given in connection with a claimant's previous application for benefits.[64] Moreover, in the instant case, the ALJ did not rely exclusively on the vocational testimony, but also relied on the Medical Vocational Guidelines (the "Grids") in order to find that there were jobs existing in significant numbers which Harmon could perform, and that, therefore, she was not disabled.

The Medical-Vocational Guidelines were established to allow the ALJ to take administrative notice of the existence of jobs in the national economy when a claimant's residual functional capacity, age, education and previous work experience meet certain specified criteria. When the characteristics of the claimant correspond to criteria in the Medical-Vocational Guidelines of the regulations, and the claimant either suffers only from exertional impairments or his non-exertional impairments do not significantly affect his residual functional capacity, the ALJ may rely exclusively on the guidelines in determining whether there is other work available that the claimant can perform. Fraga v. Bowen, 810 F.2d 1296 (5th Cir. 1987); see also Fields v. Bowen, 805 F.2d 1168 (5th Cir.1986); Dellolio v. Heckler, 705 F.2d 123, 127-28 (5th Cir.1983). Giving Harmon's subjective complaints full consideration and evaluating and comparing her

_____

[63] Rec. Doc. 13 at 8.

[64] Scheduling Order, Rec. Doc. 8 at p. 3.

testimony with prior statements and other evidence, the ALJ found her pain to be limiting but not

severe enough to preclude all types of work.[65] Recognizing that Harmon has a "long history of

sickle cell anemia and has joint pain," the ALJ found that limiting Harmon to sedentary work

activity should not cause excessive pain.[66] The ALJ recognized that "stooping and climbing

would undoubtedly cause [Harmon] some discomfort;" however, he found that only occasional

stooping and climbing, up to one-third on a given work day, should reasonably accommodate this

problem and not cause [Harmon] unbearable pain."[67]

Stooping and climbing are considered to be nonexertional restrictions.[68] The presence of

nonexertional limitations generally precludes the use of the Guidelines.  Fraga v. Bowen, 810

F.2d 1296 (5th Cir. 1987).  If those impairments, however, do not have a significant effect on the

claimant's residual functional capacity, the Guidelines may be applied.  Id.  Social Security

Ruling 96-9P states:

> Postural limitations or restrictions related to such activities as climbing ladders,
> ropes, or scaffolds, balancing, kneeling, crouching, or crawling would not usually
> erode the occupational base for a full range of unskilled sedentary work
> significantly because those activities are not usually required in sedentary work.

As Harmon's non-exertional limitations were postural in nature, they would not necessarily

affect her ability to perform sedentary jobs.  Accordingly, the presence of these nonexertional

impairment did not preclude the use of the Guidelines.

Moreover, the ALJ is only required to rely on the vocational expert's testimony in

response to the hypothetical that includes the limitations *recognized by the ALJ* as being

---

[65] Tr. 19.

[66] Tr. 18.

[67] Tr. 18.

[68] Social Security Ruling 96-9P.

Harmon's residual functional capacity. Bowling v. Shalala, 36 F.3d 431 (5th Cir. 1994). Harmon argues that the record is "barren of what effect, if any, being unable to work for 2 or 3 days out of a 7 day work week would have on the sedentary, semi-skilled jobs described by the vocational expert, Tommy LaFosse, back in 2/28/03." However, the ALJ found that Harmon's testimony about her work limitations were not supported by the record; therefore, the ALJ was not required to incorporate these limitations into a hypothetical to the vocational expert. The ALJ noted that the February 28, 2003 vocational testimony assumed "the hypothetical individual's specific work restrictions."[69] Therefore, the undersigned concludes that substantial evidence of record supports the ALJ's reliance on the hypothetical posed to the vocational expert in the previous hearing in determining that Harmon was not disabled.

Additionally, Harmon has not adduced any evidence that might have altered the result; and, therefore, has shown no prejudice. Accordingly, the undersigned magistrate judge finds that Harmon's argument that the ALJ erred in failing to secure updated vocational testimony and in relying on the vocational testimony given in connection with Harmon's previous application for benefits and related decision issued on February 28, 2003 is without merit.

### *Conclusion*

For the reasons set forth above, the Commissioner's decision is AFFIRMED and Harmon's appeal is DISMISSED.

Under the provisions of 28 U.S.C. Section 636(b)(1)(C) and Rule 72(b), parties aggrieved by this recommendation have ten (10) business days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may

---

[69] Tr. 20.

respond to another party's objections within ten (10) days after receipt of a copy of any objections or responses to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within ten (10) days following the date of receipt, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. See Douglass v. United Services Automobile Association, 79 F.3d 1415 (5ᵗʰ Cir. 1996).**

Signed at Lafayette, Louisiana on _February 6th_, 2006.

COPY SENT
DATE 2-6-06
BY v/
TO mem
RFD / ms

Mildred E. Methvin
United States Magistrate Judge
800 Lafayette St., Suite 3500
Lafayette, Louisiana 70501
(337) 593-5140 (phone) 593-5155 (fax)